**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**THOMAS M. ABRAM,**

       **Plaintiff,**

    **v.**                            **Civil Action 2:17-cv-625
Judge Algenon L. Marbley
Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL
SECURITY,**

       **Defendant.**

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, Thomas M. Abram, filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying his Title II Social Security Disability Benefits and Title XVI Supplemental Security Income Disability applications. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

## I. BACKGROUND

### A. Prior Proceedings

Plaintiff filed applications for Title II Social Security Disability Benefits and Title XVI Supplemental Security Disability Benefits on October 30, 2013, and February 25, 2014, respectively, alleging disability since February 1, 2013. (*See* Doc. 6-3, Tr. 196, 210, PAGEID #: 235, 249). Plaintiff's claims were denied initially on May 20, 2014 (Doc. 6-4, Tr. 260–66, PAGEID #: 300–06), and upon reconsideration on September 22, 2014 (*id.*, Tr. 271–79, PAGEID #: 311–19). He filed a Request for Hearing on October 8, 2014. (*Id.*, Tr. 283–84, PAGEID #: 323–24).

An Administrative Law Judge ("the ALJ") held an administrative hearing on April 20, 2016. (Doc. 6-2, Tr. 147, PAGEID #: 185). On May 12, 2016, the ALJ issued an unfavorable decision. (*Id.*, 89, PAGEID #: 127). Plaintiff requested review of the administrative decision to the Appeals Council (*id.*, Tr. 82, PAGEID #: 120), which denied his request on May 22, 2017, and adopted the ALJ's decision as the Commissioner's final decision (*id.*, Tr. 1, PAGEID #: 39).

Plaintiff filed this case on June 23, 2017 (Doc. 1), and the Commissioner filed the administrative record on September 8, 2017 (Doc. 6). Plaintiff filed a Statement of Specific Errors (Doc. 8), the Commissioner responded (Doc. 10), and Plaintiff filed a Reply (Doc. 11).

### A. Relevant Testimony at the Administrative Hearing

Plaintiff testified that he was a 46 year old, was 5'4", and weighed approximately 134 pounds. (Doc. 6-2, Tr. 151, PAGEID #: 189). Despite having a driver's license, he doesn't drive, so while his wife works, he stays at home and doesn't go out. (*Id.*, Tr. 153, PAGEID #: 191). Plaintiff was let go from his job in February 2013 because of his "problems with [his] neck and [his] back." (*Id.*, Tr. 154–55, PAGEID #: 192–93). Plaintiff elaborated on what prevents him from working:

> I've been diagnosed with spinal stenosis in my neck here. And just the pain in my arms and my hands. And my lower back, I have some disc damage and stuff in my lower back. I have a hard time sitting, walking, and the relief I get is mainly laying down. And just been getting some newer issues starting with my feet. Been getting electrical shocks in the bottom, like in my left foot, just for no reason.
>
> ***
>
> The pain is in my - - my legs. It emanates down my legs in the front and down around my knee and down my calf. My lower back, it's from the sciatic nerve I got injured, and it's just an aching pain and sometimes sharp pain. And it depends, it just variates - - variates between the two and I have a hard time just, like I say, sitting. It - - it hurts riding in a vehicle. I had a hard time coming up

> here today. I had a - - I had to lay down in the back. We made a - - my wife
> made me a little makeshift bed for the long ride. So I don't go very far in a
> vehicle because of the - - the issues of being in there. I can't stretch out or
> anything. And it's just a constant emanating pain in my legs and stuff. I feel like
> I'm walking through mud when I walk . . . But my neck, I can't look up very far.
> I have a, like I say, spinal stenosis ... which is arthritic [sic] in the neck.

(*Id.*, Tr. 158–59, PAGEID #: 196–97). Plaintiff further testified that the electrical shocks in his feet feel like he's "stepping on a - - a live wire on the floor." (*Id.*, Tr. 165, PAGEID #: 203).

Plaintiff stated that his medication helps "take[] the edge off," and without the medication he would need to go to the emergency room ("ER"). (*Id.*, Tr. 159–60, PAGEID #: 197–98). Even with medication, however, Plaintiff rated his pain between a 7 and 8 on a scale of 1–10, and he testified that his symptoms have worsened since 2013. (*Id.*, Tr. 60, PAGEID #: 198).

Plaintiff stated that he's made numerous hospital visits because he often falls as a result of his leg giving out and what he describes as a loss of "reflexes in [his] right leg after [a]sciatic nerve injury." (*Id.*, Tr. 162–63, PAGEID #: 200–01). Plaintiff testified that because of his ailments, he can't walk or go up and down the stairs, and eventually he required the use of a cane. (*Id.*). Following the loss of reflexes in his leg, Plaintiff testified that he received a series of steroid injections, but did not see any improvement. (*Id.*, Tr. 163, PAGEID #: 201).

In terms of other treatments Plaintiff has explored, he testified that he currently uses a TENS unit for "longer trips" and it helps "a little." (*Id.*, Tr. 163–64, PAGEID #: 201–02). He also stated that he had undergone physical therapy in the past, but it didn't help and, in fact, made his neck worse. (*Id.*, Tr. 164, PAGEID #: 202). Further, he wears a back brace that helps "somewhat" and he uses his cane "all the time." (*Id.*, Tr. 175, PAGEID #: 213).

Plaintiff also testified regarding certain postural limitations, stating that he cannot lift or carry anything because of his legs, cannot walk a very long distance, but is able to reach

overhead and use his hands. (*Id.*, Tr. 167, PAGEID #: 205). He stated that he thought he could squat, kneel, crouch, or crawl; but he has a hard time lifting himself off of the floor and standing up. (*Id.*, Tr. 16768, PAGEID #: 205–06). Plaintiff stated that bending is a problem. (*Id.*, Tr. 168, PAGEID #: 206). Further, Plaintiff testified he can sit for about 30 minutes before he needs to "get up and move a little or lay down," and he stated he needs to move around for three to five minutes. (*Id.*, Tr. 181, PAGEID #: 219). More specifically, Plaintiff said "sitting would be an issue for a period of time. It'd be a large issue, very large." (*Id.*).

In describing a typical day, Plaintiff testified as follows:

> I might get up late in the day because I was up the night before not able to sleep, having a hard time sleeping. I'll get up, mainly stay in bed for a while. Watch – I might watch some television if I can. There'd be days I might stay in bed all day because of my lower back. The only relief I get is if I have my legs stretched outward. If I sit downstairs or if I got into, like, the living room and sit in the chair, it's only for a certain amount of time.

(*Id.*, Tr. 169, PAGEID #: 207). Further, Plaintiff stated that he doesn't shower as much as he used to because he is fearful of falling as a result of his impairments, and his day "consists of sitting in the house in the bed focused on trying to get myself to feel better all the time." (*Id.*, Tr. 170–71, 180, PAGEID #: 208–09, 218). Plaintiff explained that he is unable to cook, help with laundry, grocery shop, put food away, clean, do the dishes, pay the bills, or clean his cat's litterbox, although he sometimes feeds the cat. (*Id.*, Tr. 172–74, PAGEID #: 210–12). He doesn't go to church, the mall, or the movies, doesn't go on walks, and doesn't visit family or friends. (*Id.*, Tr. 173, PAGEID #: 211). Plaintiff expressed feeling bad that he can't help his wife with anything and stated "[m]y wife, she's frustrated with it, I know she is, because I'm not the same person I used to be." (*Id.*, Tr. 171–72, PAGEID #: 209–10).

### B. Relevant Medical Background

#### 1. Early Imaging

An October 15, 2011 cervical MRI revealed right neural foraminal narrowing at C3-4 from disc and osteophyte, left neural foraminal narrowing at C6-7 from disc and osteophyte, and disc protrusions at C3-4, C4-5, C5-6, and C6-7.  (Doc. 6-7, Tr. 407, PAGEID #: 451).  An x-ray of Plaintiff's lumbar spine two weeks later showed spondylosis along the anterior/superior endplate at L4.  (*Id.*, Tr. 611–12, PAGEID #: 655–56).

#### 2. Dr. Jerry McCreery

Plaintiff began seeing Dr. Jerry McCreery at Family Healthcare, Inc. (and later at Hopewell Health Centers) in August 2010 for neck pain.  (*Id.*, Tr. 433, PAGEID #: 477).  Plaintiff continued to see Dr. McCreery for neck pain, as well as back pain, at numerous appointments between August 2010 and February 17, 2014.  (*Id.*, Tr. 416–33, PAGEID #: 460–77).  At a February 17, 2014 appointment, Dr. McCreery noted that Plaintiff had attended three physical therapy sessions (*see id.*, Tr. 463–68, PAGEID #: 507–12), with "no real benefit" and that his "[l]ow back pain continues."  (*Id.*, Tr. 419, PAGEID #: 463).  Accordingly, Dr. McCreery ordered a lumbar MRI.  (*Id.*; *see also id.*, Tr. 461, PAGEID #: 505).

The March 3, 2014 lumbar MRI showed degenerative changes of the discs in the lower lumbar region, disc protrusions with annual fissures at L4-5 and L5-S1, and transitional vertebral body with the S1 disc.  (*Id.*, Tr. 461, PAGEID #: 505).  Dr. McCreery reviewed Plaintiff's MRI with him at an appointment on March 31, 2014, and explained that the imaging showed mostly arthritic changes and a couple mild disc protrusions.  (*Id.*, Tr. 498, PAGEID #: 542).

*3. Dr. Michael Sayegh*

Upon referral from Dr. McCreery, Plaintiff saw Dr. Michael Sayegh for an initial pain management consultation on May 14, 2013, for his chronic neck and back pain. (*Id.*, Tr. 459, PAGEID #: 503). Dr. Sayegh indicated that he had reviewed some of Dr. McCreery's notes, as well as an x-ray of lumbar spine, and an MRI of the cervical spine from October 2011. (*Id.*, Tr. 459–60, PAGEID #: 503–04). An examination of Plaintiff's neck and mid-low back showed trigger points and tenderness bilaterally in the paraspinal muscles; mild decreased sensation in bilateral feet, worse on the right side; and a negative bilateral straight leg raising test. (*Id.*, Tr. 459, PAGEID #: 503). Plaintiff saw Dr. Sayegh at four more appointments over the next nine months, during which Dr. Sayegh made findings consistent with the initial consultation, although Plaintiff reported increased right arm pain and an increased stiffness in his neck. (*Id.*, Tr. 452–57, PAGEID #: 496–501).

On March 12, 2014, Dr. Sayegh completed a form for the Division of Disability Determination and stated Plaintiff's diagnoses, which included lumbago, sciatica, spondylosis, radiculopathy, S & F stenosis, multi-level spondylosis, and myelopathy. (*Id.*, Tr. 450, PAGEID #: 494). Dr. Sayegh explained that his clinical examination indicated, *inter alia*, mid and lower back trigger points, tenderness bilaterally in the paraspinal muscles, and decreased sensation in Plaintiff's bilateral arms, hands, and legs. (*Id.*). Dr. Sayegh stated that Plaintiff had no issues with compliance that interfered with his treatment. (*Id.*, Tr. 451, PAGEID #: 495). In terms of limitations, Dr. Sayegh opined that Plaintiff had a limited ability to sit, stand, and walk due to chronic pain, and he was unable to bend, lift, stoop, crawl, or climb. (*Id.*). Dr. Sayegh sent an almost identical form to the Division of Disability Determination on September 4, 2014, that

listed the same limitations.  (*Id.*, Tr. 503–04, PAGEID #: 547–48).

Plaintiff saw Dr. Sayegh's nurse at his next three appointments, on April 4, 2014, May 30, 2014, and September 22, 2014, respectively.  (*Id.*, Tr. 615, PAGEID #: 659).  Plaintiff saw Dr. Sayegh once again on November 20, 2014, for his pain—which he rated at an 8—in his head, neck, arms, low back, and legs.  (*Id.*, Tr. 613, PAGEID #: 657).  Dr. Sayegh noted that Plaintiff's urine drug screen was appropriate with his treatment plan and showed positive for his prescribed medication.  (*Id.*).  Physical examination again showed trigger points and tenderness bilaterally and in the paraspinal muscles, moderate decreased sensation and decreased tendon reflexes in bilateral legs, and moderate decreased sensation in both arms and hands.  (*Id.*).

Plaintiff continued to see Dr. Sayegh at numerous appointments through July 2015, where he consistently reported pain in his head, neck, arms, low back, and legs, and rated his pain as a 6 or 7 each time.  (*Id.*, Tr. 511–17, PAGEID #: 555–61).  Plaintiff's physical examinations at his appointments consistently revealed similar findings to his previous appointments.  (*Id.*).  During one appointment on March 19, 2015, Plaintiff stated that his TENS unit was helping minimally with pain relief and he requested a back brace at a May 15, 2015 appointment.  (*Id.*, Tr. 513, 515, PAGEID #: 557, 559).

On March 23, 2016, Dr. Sayegh completed a Physical Medical Source Statement.  (*Id.*, Tr. 623, PAGEID #: 667).  Dr. Sayegh opined that Plaintiff could walk one city block without rest or severe pain; could sit for 30 minutes at a time and two hours total during a work day; could stand for 30 minutes at a time and two hours total during a work day; needed a job that permitted shifting positions from sitting to standing; and may require a 5–10 minute break every hour.  (*Id.*, Tr. 624, PAGEID #: 668).  Further, Dr. Sayegh stated that Plaintiff would need to use

a cane while standing and walking, but he did not need to elevate his legs while seated. (*Id.*, Tr. 625, PAGEID #: 669). Dr. Sayegh also checked a box that Plaintiff could rarely lift less than 10 pounds (the most limited option available); could never twist, stoop, crouch, squat, or climb ladders; and could occasionally climb stairs. (*Id.*). Finally, Dr. Sayegh noted that he believed Plaintiff's impairments were consistent with the symptoms and functional limitations described. (*Id.*, Tr. 626, PAGEID #: 670).

### 4. Dr. Ron P. Linehan

During the time Plaintiff was treating with Dr. Sayegh, he was referred by Hopewell Health Centers to Dr. Ron Linehan for lumbar epidural steroid injections. (*Id.*, Tr. 621, PAGEID #: 665). A physical examination at the appointment revealed slightly decreased range of motion of the lumbar spine with pain noted during extension, mild tenderness to palpation along the lower lumbar paraspinal muscles, and a positive straight leg raise on the right. (*Id.*). Plaintiff received his first steroid injection on September 25, 2014, but after two weeks noted only mild reduction of his discomfort and stated that he continued to have moderate pain radiating from his low back into his lower extremities. (*Id.*, Tr. 619–20, PAGEID #: 663–64). A physical examination found the same findings as the first appointment, so Dr. Linehan recommended performing another injection "to build the amount of steroid in the epidural space and provide greater pain reduction." (*Id.*, Tr. 619, PAGEID #: 663).

Plaintiff received his second injection on November 11, 2014, at which time Dr. Linehan stated that a rigid back brace would provide additional support and potentially reduce his discomfort. (*Id.*, Tr. 617, PAGEID #: 661). At a December 4, 2014 follow-up appointment, Dr. Linehan noted that the injections failed to reduce Plaintiff's discomfort, and he therefore

"recommended a referral for surgical evaluation." (*Id.*, Tr. 616, PAGEID #: 660).

### 5. ER Visits

Plaintiff's impairments necessitated trips to the ER on several occasions. One such occasion was on July 21, 2010, when Plaintiff arrived at the ER complaining of neck pain that he stated he had experienced over the last eight months. (*Id.*, Tr. 521, PAGEID #: 565). Plaintiff stated that on occasion he had experienced a radiation of pain down his right arm, but had not gone to a doctor because he did not have insurance. (*Id.*). An MRI of the cervical spine showed mild disc desiccation in C3-4 and C6-7, severe right neural foraminal narrowing at C3-C4 and mild right neural foraminal narrowing at C5-6. (*Id.*, Tr. 519, PAGEID #: 563). Plaintiff returned to the ER on April 4, 2011, complaining of chronic neck pain, back pain, and an occasional tingling sensation shooting down his arm. (*Id.*, Tr. 525, PAGEID #: 569).

On September 29, 2013, Plaintiff presented to the ER with back pain that was worse with movement, reported shooting pain into the right and left legs, and stated that he was having trouble walking due to symptoms. (*Id.*, Tr. 434, PAGEID #: 478). Treatment notes state that Plaintiff appeared to be in mild distress, he could walk without assistance but with some difficulty, there was an area of local muscle/spasm/tenderness over the lower lumbar spine, and he had an abnormal straight leg raise test. (*Id.*, Tr. 435, PAGEID #: 479). On September 27, 2014, Plaintiff again went to the ER for chronic back pain, and reported pain radiating from his right lower back into his right hip and down his thigh. (*Id.*, Tr. 477, PAGEID #: 521). He could ambulate at the time, although he limped and stated it was painful to do so. (*Id.*). An examination revealed tenderness of the right-sided lower lumbar paravertebral muscles and SI joint region, as well as a positive straight leg raise on the right. (*Id.*, Tr. 477–78, PAGEID #:

521–22).  An x-ray of the lumbar spine showed degenerative changes of the discs in the lower lumbar region and disc protrusions with annular fissures at L4-5 and LF-S1.  (*Id.*, Tr. 480, PAGEID #: 524).

Plaintiff presented to the Hocking Valley Community Hospital on October 11, 2015, complaining of sharp, stabbing back pain that he rated as a 7 out of 10.  (*Id.*, Tr. 592–93, PAGEID #: 636–37).  Plaintiff stated that he had fallen that day, was between pain management specialists, and "can't take it anymore!!"  (*Id.*, Tr. 593, PAGEID #: 637).  Plaintiff was discharged but instructed to return the next day for a "recheck."  (*Id.*, Tr. 602, PAGEID #: 646).  Treatment notes reference Plaintiff following up with Dr. Anshuman Swain.  (*Id.*).

### 6. Dr. Anshuman Swain

Plaintiff saw Dr. Anshuman Swain on December 14, 2015, for his neck and low back pain.  (*Id.*, Tr. 639, PAGEID #: 683).  Plaintiff stated that the pain radiated from his low back into the bilateral lower extremity terminating at the knee and he had tingling in his feet.  (*Id.*).  The pain was described as becoming worse with sitting, standing, and walking, but improved if Plaintiff was lying down.  (*Id.*).  A physical examination revealed positive seated straight leg raise, decreased strength in the bilateral lower extremities, decreased range of motion with cervical spine rotation and extension, tenderness along both sides of the neck, cervical facet loading that is positive bilaterally, and positive Spurling test in the bilateral neck.  (*Id.*, Tr. 639–40, PAGEID #: 683–84).

Plaintiff saw Dr. Swain again on January 28, 2015, reported his pain between a 7–8, was prescribed pain medicine, and his diagnosis was listed as spondylosis w/o myelopathy or radiculopathy, cervical region.  (*Id.*, Tr. 637–38, PAGEID #: 681–82).

*7. Dr. Brian J. Oricoli*

On March 18, 2016, Plaintiff saw Dr. Brian J. Oricoli for his spinal stenosis and sciatica. (*Id.*, Tr. 642, PAGEID #: 686). Plaintiff reported "constant, dull aching, throbbing, stabbing, burning, and tingling, especially when standing and sitting for any period of time or with any physical activity. He report[ed] experiencing 'massive electrical shocks' in the left foot causing him to lose his balance and stumble." (*Id.*). Plaintiff explained that his pain was between a 7–10, and that he had been under the care of Dr. Sayegh for pain management from 2013–2015 and then saw Dr. Swain in 2016. (*Id.*). An examination revealed limited cervical and lumbar range of motion, tenderness to palpitation along the midline cervical paraspinal muscles, seated straight leg raise was normal bilaterally, and Plaintiff was noted to ambulate with a normal narrow based tandem gait patter with the use of a straight cane. (*Id.*, Tr. 642–43, PAGEID #: 686–87). Urodynamic testing (UDS) revealed that Plaintiff did not have any opioids in his system, but he admitted "he ha[d] not been using his medication routinely, but he ha[d] been stretching this out not knowing if he would be seen by any physician to manage his care." (*Id.*, Tr. 643, PAGEID #: 687). Ultimately, Dr. Oricoli opined that his subjective complaints made him "concerned for significant nerve root compression." (*Id.*).

At a follow-up appointment on March 25, 2016, Dr. Oricoli ordered an MRI of Plaintiff's cervical and lumbar spine. (*Id.*, Tr. 641, PAGEID #: 685). In the cervical region, the MRI revealed mild disc bulges without any spinal stenosis, some scattered facet arthropathy which causes minimal-mild neural foraminal narrowing at most levels with the exception of moderate-severe left-side foraminal narrowing at C3-4. (*Id.*, Tr. 648, 650, PAGEID #: 692, 694). The

lumbar imaging study revealed minimal degenerative disc changes identified with small annual tears that appeared similar to the previous study in 2014. (*Id.*).

### 8. Psychological Evaluations

On May 5, 2014, Dr. Gary S. Sarver completed a Psychological Evaluation of Plaintiff at the request of the Division of Disability Determination. (*Id.*, Tr. 469, PAGEID #: 513). Plaintiff's affect was noted as constricted, his mood was subdued, and he reported hopelessness and helplessness "about my back." (*Id.*). Dr. Sarver diagnosed Plaintiff with adjustment disorder with anxiety and depression, and stated that "[t]here did not appear to be exaggeration or minimization of symptoms. There did not appear to be significant self-report inconsistencies, or discrepancies with available supplemental information." (*Id.*, Tr. 474, PAGEID #: 518).

Plaintiff underwent another mental health assessment at Six County, Inc. on February 13, 2015. (*Id.*, Tr. 558, PAGEID #: 602). Treatment notes state that Plaintiff "sat on the end of his chair because of his back pain" and did "not want to stand or sit still because of the potential for numbness or shooting pain." (*Id.*, Tr. 561, PAGEID #: 605). Plaintiff reported difficulty managing his daily living, stated he had undergone less self-care in the years since his injury, and he had unsatisfying sleep most or all of the time. (*Id.*, Tr. 562, PAGEID #: 606).

### 9. State Agency Consultants

On April 23, 2014, Dr. Maria Conglabay opined that Plaintiff could occasionally lift 20 pounds, frequently carry 10 pounds, could stand for 4 hours, could sit for an unlimited amount of time, could occasionally stoop, kneel, crouch, crawl, and climb ramps/stairs, but could never climb ladders. (Doc. 6-3, Tr. 217–19, PAGEID #: 256–58). On September 8, 2014, Dr. Lynne Torello made the same findings, except that she found Plaintiff could six for 6 hours in an 8 hour

work-day, as opposed to unlimited sitting.  (*Id.*, Tr. 250–52, PAGEID #: 289–91).

### C.  The ALJ's Decision

The ALJ found that Plaintiff suffered from the following severe impairments:  cervical degenerative disc disease; lumbar degenerative disc disease; left shoulder status post-surgery in 2012; and adjustment disorder with mixed anxiety and depressed mood.  (Doc. 6-2, Tr. 94, PAGEID #: 132).  The ALJ held, however, that Plaintiff did not have an impairment or combination of impairments that met or equaled a listing.  (*Id.*, Tr. 95, PAGEID #: 133). Specifically, the ALJ explained that Plaintiff did not meet Listing 1.04 because he did "not have nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in psuedoclaudication."  (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ stated:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) and meaning the claimant can occasionally lift and/or carry 15 pounds and frequently lift and/or carry 10 pounds; sit for 6 hours in an 8-hour workday and stand and/or walk for 4 hours in an 8-hour workday, with a sit-stand option every 30 minutes; unlimited pushing and pulling; occasionally reach overhead with the right arm; occasionally climb ramps and stairs; never climb ladders, ropes or scaffolds; unlimited balancing; occasionally stooping, kneeling, crouching, and crawling; never driving; limited to simple, routine tasks and simple work-related decisions; and occasional interaction with supervisors and coworkers.

(*Id.*, Tr. 97, PAGEID #: 135).

In terms of weight given to the physicians, the ALJ assigned "some weight" to state agency consultants Dr. Conglabay and Dr. Torello.  (*Id.*, Tr. 100, PAGEID #: 138).  The ALJ reasoned that, although their opinions were consistent with the record on the dates the opinions were provided, they "did not have the opportunity to review the claimant's more recent medical records or hear his testimony at the hearing, which establish[ed] that he has more limitations than

13

first determined by the consultants." (*Id.*). For example, the ALJ noted that the latter records demonstrated that Plaintiff needed a sit–stand option. (*Id.*).

The ALJ then assigned "less weight" to Dr. Michael Sayegh, stating that his opinions "do not merit controlling weight":

> He is a physician who treated the claimant from May 2013 to July 2015, and thus, he is an acceptable medical source who is also a treating source. However, the limitations in one opinion are inconsistent with the limitations in the other opinion and are inconsistent with his own treatment notes and the rest of the record. For instance, in 2014, he opined that the claimant should do no bending, lifting, stooping, crawling, or climbing, yet in 2016, he opined he should rarely lift less than 10 pounds and could occasionally climb stairs. Also, a review of his treatment notes shows the physical examinations that he performed upon the claimant were not very thorough, and thus, his findings were not very detailed. In fact, when asked for the basis of his opinion, he indicates the claimant's pain, sensation, and range of motion, which are reported and controlled by the claimant. Moreover, at the time he provided the second opinion, he was no longer treating the claimant. In fact, he had not treated the claimant for almost a year when he provided his opinion, and thus, he based his opinion on past records only, which do not include results of manual muscle testing and other testing. Furthermore, the limitations in both opinions are too restrictive in comparison to his treatment notes and the rest of the record.

(*Id.*).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). "Therefore, if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

## III.    DISCUSSION

Plaintiff asserts the following assignments of error:  (1) the ALJ failed to properly evaluate the opinion of his treating physician, Dr. Michael Sayegh; (2) the ALJ failed to properly evaluate his impairments under Listing 1.04; and (3) the ALJ failed to recognize and consider Plaintiff's asthma as a medically determinable impairment.  (Doc. 8).

### A.   Treating Physician

Two related rules govern how an ALJ is required to analyze a treating physician's opinion.  *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016).  The first is the "treating physician rule."  *Id.*  The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record."  *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion."  *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2).  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010).  In

15

order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Plaintiff argues that the ALJ failed to explain which of Dr. Sayegh's opined limitations were found to be inconsistent with the record and failed to elaborate on, or explain, the alleged inconsistencies. (Doc. 8 at 8). Further, Plaintiff avers that the ALJ's conclusion that Dr. Sayegh's examinations were "not very thorough" and that his opinions were "inconsistent" with each other is not factually correct, and thus do not qualify as "good reasons" to discount the opinion. (*Id.* at 8–9). The Court agrees.

In explaining her decision to grant Dr. Sayegh "less weight," the ALJ stated that Dr. Sayegh's opined limitations in both opinions were too restrictive in comparison to his treatment notes and the rest of the record. (Doc. 6-2. Tr. 100, PAGEID #: 138). However, the ALJ "does not offer any explanation for [her] conclusion" that Dr. Sayegh's opinions were too restrictive, or inconsistent, with the medical evidence, which is enough by itself for error. *Blackburn v. Colvin*,

No. 5:12CV2355, 2013 WL 3967282, at *7 (N.D. Ohio July 21, 2013). Indeed x-rays and MRIs consistently showed degenerative changes, disc protrusions, and mild to severe foraminal narrowing. (Doc. 6-7, Tr. 407, 461, 480, 519, 611–12, 648–50, PAGEID #: 451, 505, 524, 563, 655–56, 692–94). Further, treatment notes from various doctors consistently revealed tenderness over the lower lumbar spine (*id.*, Tr. 435, 477–78, 621, 639–40, PAGEID #: 479, 521–22, 665, 683–84), decreased range of motion (*id.*, Tr. 621, 639–40, 642–43, PAGEID #: 665, 683–84, 686–87), and several positive/abnormal straight leg raise tests (*id.*, Tr. 435, 477–78, 621, 639–40, 642–43, PAGEID #: 479, 521–22, 665, 683–84, 686–87). Accordingly, the objective medical evidence and evaluations of the other examining physicians seem to support Dr. Sayegh's findings.

Additionally, "no physician who actually examined [] [P]laintiff opined that []he could perform the physical functions necessary" for the RFC the ALJ ultimately reached. *See Olson v. Comm'r of Soc. Sec.*, No. 04-10021-BC, 2005 WL 806718, at *4 (E.D. Mich. Apr. 7, 2005). Instead, Dr. Sayegh was the only examining physician to opine on Plaintiff's limitations, and, although the ALJ concluded that Dr. Sayegh's opinions were too restrictive based on his treatment notes, she offered no explanation for that finding. Thus, without more elaboration, her explanation is ambiguous and "hinders a meaningful review of whether the ALJ properly applied the treating-physician rule." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 377 (6th Cir. 2013).

The other reasons the ALJ provided for assigning Dr. Sayegh less than controlling weight have little support in the record. For example, the ALJ notes that in 2014 Dr. Sayegh opined that Plaintiff should do no bending, lifting, stooping, crawling, or climbing, yet in 2016, he opined

that Plaintiff should rarely lift less than 10 pounds and could occasionally climb stairs. Plaintiff correctly points out, however, that in the 2016 Medical Source Statement, Dr. Sayegh checked the most restrictive box— "rarely"—to answer the question how often Plaintiff could lift and carry less than 10 pounds. (Doc. 6-7, Tr. 625, PAGEID #: 669). Thus, to opine that the 2014 and 2016 lifting restrictions are "inconsistent" is inaccurate. Further, in 2016, Plaintiff had been prescribed a cane, which he did not have in 2014, so the fact that Dr. Sayegh now believed Plaintiff could climb stairs does not on its own make his two opinions inconsistent.

The ALJ also states that a review of Dr. Sayegh's treatment notes show the physical examinations performed on Plaintiff were not very thorough, and thus, his findings were not very detailed. However, Dr. Sayegh's notes largely contain sufficient information on his examinations. Plaintiff testified at his hearing that Dr. Sayegh would spend time with Plaintiff at each appointment, examine him, and ask him questions. (See Doc. 6-2, Tr. 17677, PAGEID #: 214–15). Any suggestion by the ALJ to the contrary, without any details of how she reached her conclusion, is unsupported by the record.

Finally, the ALJ relies on the fact that Plaintiff had not seen Dr. Sayegh for several months at the time he completed the March 2016 Physical Medical Source Statement. It is worth noting, however, that Plaintiff did not choose to stop seeking treatment from Dr. Sayegh, but rather, Dr. Sayegh stopped taking Plaintiff's insurance. (See Doc. 6-2. Tr. 177, PAGEID #: 215 (Plaintiff testified at the hearing that he stopped seeing Dr. Sayegh because "[i]nsurance problems with my insurance company conflicting with his," as he would no longer take his Medicaid-type anymore)). Moreover, while it is true that Dr. Sayegh's opinion in 2016 was based on his treatment of Plaintiff several months prior, no other doctor provided a more recent

medical source statement. In addition, the ALJ assigned "some weight," to the state agency opinions from 2014. Accordingly, the fact that Dr. Sayegh had not seen Plaintiff since July 2015 was not a "good reason" to discount Dr. Sayegh's opinions as compared to the more dated state agency consultants' opinions.

Taking all of the above into account, the Court finds that the ALJ failed to provide good reasons for assigning the treating source opinions less than controlling weight because the ALJ's decision failed to assess Dr. Sayegh's opinions in accordance with the two-prong controlling weight test. *Dejaeghere v. Comm'r of Soc. Sec.*, No. 15-10710, 2017 WL 1196369, at *6 (E.D. Mich. Mar. 31, 2017). "First, the decision does not discuss whether the treating providers' opinions are well-supported by medically acceptable clinical and laboratory diagnostic techniques, and second it does not properly assess their inconsistency with other substantial evidence." *Id.*; s*ee also Olson*, 2005 WL 806718, at *1 ("If a treating physician's opinion is not contradicted, complete deference must be given to it") (citing *Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984)).

In certain circumstances, however, an ALJ's failure to give good reasons for rejecting the opinion of a treating source may constitute *de minimis* or harmless error. *Wilson*, 378 F.3d at 547. *De minimis* or harmless error occurs: (1) if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; (2) if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion; or (3) where the Commissioner has met the goal of the procedural safeguard of the good reasons rule even though an ALJ has not complied with the express terms of the regulation. *Id.* Importantly, the

Commissioner has not argued harmless error.  Further, the undersigned concludes that none of the harmless-error factors apply here.

### B.  The Remaining Assignments of Error

Plaintiff also argues that the ALJ erred in failing to properly evaluate his impairments under Listing 1.04 and failing to consider Plaintiff's asthma.  However, the Court's decision to recommend reversal and remand on the first assignment of error alleviates the needs for analysis on Plaintiff's remaining assignments of error.  Nevertheless if the recommendation is adopted, the ALJ may consider Plaintiff's remaining assignments of error on remand if appropriate.

## IV.    CONCLUSION

For the reasons stated, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

### Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. § 636(b)(1).  Failure to object to the Report and Recommendation will result in a waiver of the

right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140, 152–53 (1985).

IT IS SO ORDERED.


Date: March 7, 2018                                    /s/ Kimberly A. Jolson
                                                       KIMBERLY A. JOLSON
                                                       UNITED STATES MAGISTRATE JUDGE